## McINTYRE vs. WHITING.

APPEAL FROM THE COURT OF THE FIFTH DISTRICT, THE JUDGE OF THE SEVENTH PRESIDING.

When a suit is brought in one parish and transferred to another, where it is tried, and where judgment is rendered, the clerk of the court in which the cause originated, cannot, on appeal, certify to the record.

A judgment record is admissible in evidence to prove a judgment against the defendant, rendered in another State, on which judgment the suit is instituted: although the plaintiff knows the existence of another record, showing the defendant to have taken the benefit of the insolvent laws of that State and that the plaintiff was one of his assignees.

<div style="text-align: right; font-style: italic">

WESTERN DIS
*September*, 1833.

M'INTYRE
vs.
WHITING.

to opposition
through and by
the authority of a
court.

</div>

WESTERN DIS    The plaintiff had obtained two judgments against the
September, 1823.
defendant in the city of Philadelphia, in 1823; each for
M'INTYRE      about the sum of thirteen hundred dollars.   Actions were
vs.
WHITING.      instituted on each of those judgments.

The defendant pleaded the general denial, an assignment
of all his property, and a discharge under the insolvent laws
of Pennsylvania, from all debts due by him prior to 1824.
He alleged that the plaintiff, as one of his then creditors,
shared in the benefit of this assignment, and should have
credited him with the proceeds of his property thus assigned.

The two actions were consolidated.

On the 9th of October, 1832, the defendant's attorney
made his affidavit for a continuance, because the copy of the
record of the defendant's arrest, assignment and discharge,
under the insolvent laws of Pennsylvania, was then in New-
Orleans, where it had been sent to aid in the defence of a
similar suit, there brought against the defendant; and,
although due diligence had been used, it could not be pro-
cured in time for the trial.   He expected to show by this
record, that the defendant was entitled to large credits on
the claims set up in the petition, and was compelled to
resort to it by the evasive answers of the plaintiff to the in-
terrogatories propounded to him by the defendant.   The
continuance was granted.   The plaintiff admitted as true,
the facts set forth in the affidavit; the order of continuance
was rescinded, and the parties ordered to proceed to the
trial.

On the following day, the trial came on.   The defend-
ant objected to the reading in evidence by plaintiff of
the two records, on which the consolidated action was based,
until the record mentioned in the affidavit of the defendant's
attorney, as then being in New-Orleans, should be produced.
This objection was overruled, and a bill of exceptions
taken.

On the 12th of the same month an order was made, trans-
ferring the cause to the parish of St. Martin, giving the
same effect to the judgment to be there rendered, as it would

WESTERN DIS
*September*, 1833.

M'INTYRE
*vs.*
WHITING.

have if rendered in St. Mary, where the suits had been brought. Judgment was rendered against the defendant for two thousand five hundred and eighty-eight dollars, and was dated at St. Martinsville, October 30th, 1832. No testimony appears to have been taken down on the trial, no statement of facts agreed on, or a statement made by the judge *a quo.*

The defendant appealed.

On the 3d of June following, the clerk of St. Mary certified as follows: "that the foregoing pages contain a full and complete transcript of the record," &c., "and that they contain a complete transcript of all the evidence adduced in the District Court on the trial," &c.

*Splane,* for the plaintiff and appellee, moved to dismiss the appeal,

1. Because the clerk's certificate to the record was insufficient, and not made in conformity to law. 3 *La. Reports,* 294.

2. Clerks of courts have no authority to certify the record as containing all the testimony produced in the cause, unless they are ordered on the trial to take it down or note it in the proceedings. In this case, the evidence is all documentary.

3. In relation to the demand, admitting that the defendant has been released, so as to protect him from arrest for all prior contracts, by the laws of Pennsylvania, that will not protect him here, where the contract is to be enforced. 11 *Martin,* 730.

4. When it is clear that the evidence, the absence of which is alleged in the affidavit as cause of continuance, would be of no avail, if produced, the cause will not be remanded.

5. The affidavit, the facts of which were admitted, does not state that the record alluded to as absent, would disprove any of the answers of the plaintiff to interrogatories that are material.

6. All the answers are evidence, until disproved in the manner pointed out by law. *C. of Pr.* 354.

PORTER, J., delivered the opinion of the court.

WESTERN DIS
September, 1833
M'INTYRE
vs.
WHITING.

This case is presented for examination on the merits by the appellant, on a certificate given by the clerk of the District Court of the parish of St. Mary, eight months after judgment was rendered below, and seven months and a half after the appeal was taken. The certificate affirms, that the record contains all the evidence on which the cause was tried in the first instance. There is no statement of facts, nor does there appear any evidence taken down by the clerk.

Various objections have been taken to this certificate; we find it unnecessary to notice any other save that which relates to the want of authority in the clerk by whom the certificate was given. The cause originated in the parish of St. Mary, but was tried in that of St. Martin, for we find on record the following entry: "ordered that the suit be transferred to the District Court of St. Martin, to be tried there, and the judgment to have the same effect as if rendered here." We are sensible as the counsel who argued this cause for the appellee can be, of the great danger of receiving certificates from clerks or judges, long after the cause is decided; but, without saying what our opinion might be, had the certificate been given by the clerk of the court which tried the cause, we are quite clear it cannot be received from one where it was not tried.

*When a suit is brought in one parish and transferred to another, where it is tried and where judgment is rendered, the clerk of the court in which the cause originated, cannot, on appeal, certify to the record.*

This is a bill of exceptions found in the record, to an opinion of the judge, admitting records of judgments given against the defendant in Philadelphia, to be read in evidence, on the ground that the plaintiff had admitted that there was a record in existence which would show that the defendant had taken the benefit of the insolvent law of Pennsylvania, and that the plaintiff was one of his assignees. We do not see what ground there is presented for refusing the evidence of the debt sued on, and are of opinion that the judge did not err.

*A judgment record is admissible in evidence to prove a judgment against the defendant, rendered in another state, on which judgment the suit is instituted, although the plaintiff knows the existence of another record, showing the defendant to have taken the benefit of the insolvent laws of that state, and that the plaintiff was one of his assignees.*

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.

# REPORTS

OF

## CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT

OF THE

## STATE OF LOUISIANA.

**WESTERN DISTRICT:**
ALEXANDRIA, OCTOBER, 1833.

### BROWN vs. FRANTUM.

APPEAL FROM THE COURT OF THE SIXTH DISTRICT, THE JUDGE OF THE
SEVENTH PRESIDING.

WESTERN DIS
October, 1833.

BROWN
vs.
FRANTUM.

| 6 | 39 |
| 111 | 392 |

A bequest was made of a tract of land "containing ten arpents front with the ordinary depth, to be laid off on the right hand side of bayou Bœuf, descending at a small distance below Robinett's line at a gully." It was proved there was no gully below R's. line, but there was one five arpents above it. Held as there is no gully below the line, the line must be taken as the boundary; and that the intention of the donor cannot be defeated by such an error as to the situation of the gully.

The right acquired by each of two purchasers of the same tract of land from the same vendor, the title of either of whom requires for its validity as to third persons, only a due registry before the other, is a subject of sale or legacy.

A. and B. verbally agreed that one might sell any part of the other's land, and the other was bound to approve the location. A. had sold a certain quantity of B's. land, and it was held that B. might bequeath the same quantity of A's. land.

A verbal agreement for land or slaves is not null and void; its defect relates solely to the proof; and if one of the parties acknowledge the agreement, or permits parol evidence of it to be given without opposition, the agreement will be carried into effect.

Confirmative acts dispense with the exhibition of the primordial title when its tenor is therein specially set out.

Where the heirs of a testator acquire a title in that quality to property in consequence of a right existing in their ancestor at the time of his death, and which right he had made the subject of a legacy, the title so acquired accrues to the benefit of the legatee.

A mandatary under a special power must confine himself strictly within the limits assigned to him, and those dealing with him must at their peril see that he does not exceed his authority; but they need not, in search of his powers and their limitations, look beyond the instrument of mandate.

A declaration that the vendee is acquainted with the title, means that he has a knowledge of the title under which his vendor acquired the property, but not he knows the vendor has divested himself of that title.

The plaintiff sues for a tract of land on bayou Bœuf, containing ten arpents front by forty, being part of the Indian purchase, and set apart in the division to Samuel L. Wells, and by him divised to his son Willis, who sold it and conveyed it to the plaintiff's late husband. She prays to be restored to possession and quieted in her title.

The defendant sets up title and pleads the prescription of ten years in pursuance of uninterrupted possession under a good title.

The plaintiff derives her title from the following clause in the last will and testament of S. Levi Wells, made in 1815. "I give and bequeath to William Wells, &c., a tract of land containing ten arpents front with the ordinary depth, to be laid off on the right hand side of bayou Bœuf descending, a small distance below Robinett's line, &c." Willis Wells sold and conveyed this land to Hugh Brown, late husband of the plaintiff. *Vide* 3 *La. Rep.* 128.

Porter, J., delivered the opinion of the court.

This is a petitory action. The plaintiff claims ten arpents of land in front on the right bank of bayou Bœuf, embraced within the limit of the purchase made by Millar and Fulton of three tribes of Indians, an acquisition which has been fruitful of much litigation. In the present case both parties claim under persons who were partners or joint proprietors of the lands sold to the persons just mentioned.

The plaintiff's title must be first examined. She claims under Levi Wells, who was admitted by Millar and Fulton to share with them in the purchase which they made of the Indians, and mediately of Millar, from whom she alleges Wells acquired the *locus in quo*.

Sometime after the sale from the Indians, Millar, Fulton, Wells, and ɪ larke, proceeded to m ike a survey of the premises, and to lay off the portion each was entitled to. The facts relating to this transaction, are circumstantially detailed in the case of *Compton* vs. *Mathews*, and need not be repeated here, 3 *La. Rep.* 28.

It is proved by parol evidence, that an agreement not reduced to writing, existed between Millar and Wells, that in case either of them sold lands within the limits assigned to the other, that the same quantity should be given out of the portion of the vendor in lieu thereof. This statement is made in the belief that it is justified by the proofs in the cause. The objections made to its correctness will be noticed hereafter.

In pursuance thereof, Millar sold land within the limits of the land set apart to Wells, and on the 28th of May, 1815, Wells, by last will and testament, bequeathed to his natural son Willis Wells, ten arpents of land, embraced by the portion which fell to Millar in the original partition. The description given to this legacy in the will is in the words, "I give and bequeath to Willis Wells, and his heirs and assigns for ever, a tract of land containing ten arpents front with the ordinary depth, to be laid off on the right hand

side of bayou Bœuf, descending, at a small distance below Robinett's line, at a gully."

Subsequent to the execution of this testament, and previous to the month of April, 1820, Millar gave a power of attorney to one Scott, to relinquish to the heirs of Wells his right to so much land within the limits of his part of the Indian purchase, as would be equivalent to the quantity he had sold within the portion of their father. As the power conferred by this mandate, has been the subject of much contest at the bar, and as a true understanding of it, has an important influence on the rights of the parties now before us, it is proper to set it out at length. What follows is a copy of that given in evidence.

"Know all men by these presents, that whereas, William Millar and Levi Wells, in his life time, held each a portion of the land purchased of the Chocto, Pascagoula, and Biloxi Indians, situated on the bayou Bœuf, in the parish of Rapides, and whereas, the lines were not ascertained, and whereas, it was understood that William Millar might dispose of certain lands at designated places, particularly to Clements and Gardner, upon his conveying to the said Wells as much land as should appear to belong to the said Wells when the lines should be new and the quantity ascertained. Now, therefore, I William Millar, do by these presents, constitute and appoint Thomas C. Scott, my true and lawful attorney for this special purpose, to convey to the heirs of Levi Wells as much land out of my claim as shall appear to fall within their lines which I have sold, but without any warranty: and I will warrant what he shall do in the premises."

On the 17th April, 1820, the agent thus appointed, and the heirs of Levi Wells, passed an act which was duly recorded in the office of the parish judge of the parish of Rapides, where the land now in dispute is situated. By this act the attorney of Millar relinquished to the heirs of Wells, thirty-seven arpents in front to begin on the lower corner of a tract of land belonging to the estate of Levi Wells, thence down the bayou, descending. It is expressed that the

relinquishment is made without warranty, for any defect in the title, or dimunition of the land, the purchasers acknowledging themselves to be well acquainted with the title and satisfied therewith. On the other part, the heirs of Wells relinquish to Millar the title to ten arpents in front, sold by him to Gardner, and twenty-seven arpents in front sold to Clements. At the close of the instrument the following clause is found, "for a more full explanation of this sale or exchange reference is made to the power of attorney of William Millar hereto annexed." That power has been already set out.

Willis Wells, the legatee of Levi Wells, sold the ten arpents in front bequeathed to him, to the husband of the plaintiff. Under this purchase, she in her own right, and as her representative of the heirs of her husband, claims the *locus in quo.*

The defendant's pretensions rest on a sale made by Millar to Daniel Clarke, on the 19th March, 1812. The instrument was executed before Pierre Pedescleaux, a notary public of New-Orleans, and conveys twenty-five arpents of land on the front of the bayou Bœuf, with the depth which may be found, bounded above by lands of Levi Wells, and below by those of the vendor. This sale was prior in point of time to the bequest made by Wells in his will, and to the relinquishment made on the part of Millar of the land so bequeathed, but it never was recorded in the parish where the property is situated. A great deal has been said on the part of the plaintiff, in regard to the true location of the land which passed by this conveyance, and it has been strenuously contended, that it was contemplated to convey premises lying at a great distance from the place now in dispute. On the part of the defendant it has also been seriously urged, that the relinquishment on the part of Millar does not embrace the *locus in quo.* Neither of these objections appears to us well founded. The evidence satisfies us, that both conveyances cover the contested land, and that the case must be decided on the strength of the respective titles.

The first ground taken in opposition by the plaintiff's

title, is the want of identity between the land bequeathed to Willis Wells, and that now sued for. This objection rests principally, if not solely, on a fact proved in evidence, that there is no *gully* between Robinett's line, but that there is one five arpents above it, and that a gully a small distance below the line of Robinett is given in the will of the testator as the boundary. By an article of our old code in force at the time the testament was made, and at the time it was opened, it is provided, that "if any obscurity be found in the meaning, or the terms of the disposition, either as to the person to whom it is made, *or as to the thing bequeathed*, the judge must endeavor to discover what was the intention of the donor. If then there be no *gully* below the line, we must take that line as the boundary. It is clear the intention of the donor was to give ten arpents of land, and the intention cannot be defeated by an error as to the situation of the *gully*, more especially as we have another limit which enables us to give the bequest a specific location. *C. Code*, 253, *art.* 200.

It is next objected that the gift to Willis Wells is null and void, because by a positive provision of our code, the legacy which is made of the property of an other is declared to be so, whether the testator knew the fact or was ignorant of it. In the application of this principle of law to the case before us, it is urged, that at the time and before Wells bequeathed the land to his son, Millar had already sold it to Clarke. It was consequently Clarke's property, and could not be the subject of a testamentary disposition in Wells' will. This argument overlooks the familiar doctrine of our law that the purchaser of real estate may be the owner *quoad* the vendor, and that he is not so in relation to third persons who may acquire a real right into or on the thing, until his contract is duly registered in the parish where the property is situated. Our law declares that the sale of the property of another is null and void, and yet nothing is more common than that the second vendee who *bona fide* buys, and records his title, holds the object bought in preference to a previous purchaser who neglects this formality. In such a case there-

A bequest of a tract of land "containing ten arpents front with the ordinary depth, to be laid off on the right hand side of bayou Bœuf descending, at a small distance below Robinett's line at a gully." It was proved there was no gully below R.'s line, but there was one five arpents above it. Held ast here is no no gully below the line, the line must be taken as the boundary; and that the intention of the donor cannot be defeated by such an error as to the situation of the gully.

fore, both are owners in relation to their vendor, and either
may become so as it respects all other persons by duly
enregistering his contract. This right may in our opinion be
the subject of a sale or of a legacy. Any other construction
would lead to a curious result. If the party lived and re-
corded his deed first, he would become the owner. And if
he died his heirs could not do the same thing, and with the
same result. Yet, if he gave it as a legacy, his title was
destroyed, because it was the property of another! But if
it was the property of another, in the sense contended for,
how could it become that of the party who recorded, by an
act which surely proceeded from him ? *O. Code*, 240, *art.* 147,
*ibid.* 348, *art.* 20.

The right, ac-
quired by each of
two purchasers of
the same tract of
land from the
same vendor, the
title of either of
whom requires
for its validity as
to third persons,
only a due re-
gistry before the
other, is a subject
of sale or legacy.

This brings us to the inquiry whether at the time Levi
Wells made his will, he had such a right in the land, as
enabled him, in case that right was subsequently evidenced
by a written act duly registered, to hold the property. It is in
evidence that a parol agreement existed between Millar and
Wells, that if a buyer from either should be located within
the portion of the *Indian purchase* set apart to the other, they
would approve of the location and take in lieu thereof the
same quantity of land within the limits belonging to the ven-
dor. In other words they agreed to exchange lands in case the
contingency contemplated should occur. That contingency had
happened before Wells made his will, and before Millar sold
to Clarke.   In the years 1809 and 1810, Millar sold one
tract of land to Gardner, and an other to Clements, both of
which he located within the portion that belonged to Wells.
These sales gave to Wells a right to take the same quantity
within the part which had fallen to Millar in the partition.
But it is urged the choice of the land out of which the reim-
bursement was to be made, belonged to Millar, and that
Wells could not select a particular spot, and make it either
the object of a sale, or gift.   In looking into the correct-
ness of the position, it is unnecessary to inquire in whom the
right of selection would be vested, under a contract where
the owner agreed to sell an indefinite part of a larger tract
of land for a sum of money.   The contract before us must be

carried into effect, according to the intention of the parties, as fairly deduced from the stipulations made by them. The construction contended for would violate that intention, as we understand it, would cause great unequality in the rights of those who contracted, and might have worked gross injustice. The agreement as proved, proceeds on the idea that one of the parties might sell *any* part of the land belonging to the other, and the party whose land was thus sold, was bound to approve the location. Reciprocity, therefore, required that the same latitude of choice should be given to the party who was to be reimbursed. Wells might, in the first instance, have sold any part of Millar's tract, and his authority to do so, was certainly not diminished by Millar having previously sold within his, Well's, portion. Any other construction would give an undue advantage to the party who first exercised the right which the agreement conferred. If this matter was doubtful, which it is not, we have the construction given to the contract by one of the parties, with the express consent of the other to do away that doubt. Wells did dispose of land of Millar according to Well's choice, and Millar subsequently ratified it. We therefore think that at the time Wells made his will, he had a right to any portion of Millar's tract equal in quantity to that which the latter had sold in the portion belonging to him.

A. and B. verbally agreed that one might sell any part of the other's land and the other was bound to approve the location; A had sold a certain quantity of B's land, it was held that that B might bequeath the same quantity of A's land.

But it is further objected that the interest shown to exist in Wells to the land, which enabled him to make it the object of a legacy, is proved only by parol evidence, that his contract was not reduced to writing, and that it was null and void. This court has repeatedly decided that a verbal agreement for land or slaves, even under the provisions of our code was not null and void. That the defect which such a contract presented, related solely to the proof, and if one of the parties acknowledged the agreement, or permitted parol evidence to be given of it without opposition, it was the duty of a court of justice to carry it into effect. Here we have written proof from the vendor that such a parol agreement did exist. The conveyance of the agent of Millar under the

A verbal agreement for the sale of land or slaves is not null and void, its defect relates solely to the proof; and if one of the parties acknowledges the agreement or permits parol evidence to be given without opposition, the agreement will be carried into effect.

WESTERN DIS
*October*, 1833.

BROWN
*vs.*
FRANTUM.

power of attorney, expressly recognises it. This conveyance is not a new contract as was contended in argument, it is based on, and recognitive of an agreement previously existing, and confirmative acts dispense with the exhibition of the primordial title when its tenor is specially set forth. In this instance Mill ir's power of attorney states the agreement which had existed, and the conveyance of the agent refers to that power for a more ample explanation of the act passed by him. *O. Code*, 308, *art*. 237.

It is next urged that the confirmation made by Millar to the heirs of Wells enured to their benefit, and not to that of the legatee. We have some doubt whether this objection can be made by a third party against him who is in possession under the will. But we have no doubt that when the heirs of a testator, acquire a title in that quality to property, in consequence of a right existing in their curator at the time of his death, and which right he had made the subject of a legacy, that the title so acquired, enures to the benefit of the legatee, because it was the duty of the heirs to carry the will into effect. *O. Code*, 240, *arts*. 141 and 142.

This brings us to the last point of importance in the cause, viz: the want of authority in Millar's attorney to convey to the heirs of Wells the *locus in quo*. The power has been already set out. It authorises the agent to convey the same quantity of land within Millar's claim, which Millar may have sold out of Wells'. It is urged that it never could have been in the contemplation of the principal to have confered authority on his agent to convey to the heirs of Wells, lands which had already been alienated to Clarke, and thus make him responsible in damages. This we readily believe. Authorities have been cited to us, that mandataries under a special power must confine themselves strictly within the limits assigned to them, and that those who deal with them must at their peril see they do not exceed their authority. To which doctrine we also accede. But this doctrine like every other must be applied with these limitations which, necessarily, belong to it. It is true the party contracting must at his peril see the agent does not exceed his authority, but

Confirmative acts dispense with the exhibition of the primordial title when its tenor is therein specially set forth.

Where the heirs of a testator acquire a title in that quality to property, in consequence of a right existing in their ancestor at the time of his death, and which right he had made the subject of a legacy; the title so acquired enures to the benefit of the legatee.

A mandatary under a special power must confine himself strictly within the limits assigned to him, and those dealing with him must at their peril see that he does not exceed his authority: but they need not in search of his powers and their limitations look beyond the instrument of mandate.

BROWN
*vs.*
FRANTUM.

A declaration
that the vendee is
acquainted with
the title, means
that he has a
knowledge of the
title under which
his vendor ac-
quired the pro-
perty, but not he
knows the ven-
dor has divested
himself of that
title.

*Rigg* and *Winn*, for plaintiff and appellant.

*Janin* and *Boyce*, for defendant and appellee.